*[705]
 
 JOSEPH, J.
 

 Defendant appeals from the judgment on his conviction for burglary in the first degree (ORS 164.225). He assigns as error: (1) an instruction on flight, (2) an instruction on the permissibility of inferring intent from the performance of an illegal act, (3) refusal to suppress in-custody statements made by the defendant, (4) refusal to suppress evidence of an out-of-court identification, and (5) refusal to hold that the existence, practices and policies of the district attorney’s Career Criminal Unit violate a defendant’s constitutional rights.
 

 The flight instruction
 

 1. The trial court gave this instruction:
 

 "The flight of the defendant or his concealment from the police after the commission of a crime is not sufficient by itself to establish his guilt, but it is a fact which, if proven, may be considered by you in the light of all the other facts and circumstances in the case in deciding the question of the defendant’s guilt. It is your duty to determine whether or not there was such flight or concealment and if you find there was, then it is your duty also to determine what the defendant’s purpose or motive was which prompted him to act in that manner.”
 

 Defendant excepted to the instruction, but the terms of the exception were not particularly clear.
 
 [1]
 

 In this court defendant argues, in part at least, that no flight instruction ought to have been given, relying on
 
 State v. McCormick,
 
 28 Or App 821, 561 P2d 665,
 
 *[706]
 
 Sup Ct
 
 review allowed
 
 (1977). We cannot read the exception as adequate to raise that broad point. The assertion in the trial court was that the instruction,
 
 as given,
 
 tended to emphasize flight as an indication of guilt. The exception did not call for ruling of the sort involved in
 
 McCormick,
 
 and that issue is therefore not before us.
 

 On the point actually raised by the exception, we are not persuaded that the instruction was harmful. It told the jury it could consider flight as a fact bearing on guilt and that the "purpose or motive” of the flight was in fact to be determined. Unlike the instruction challenged in
 
 State v. Greene,
 
 30 Or App 1019, 568 P2d 716 (1977), it did not suggest any particular inference, and it was a correct statement of law. Both parties argued the flight facts to the jury. There was no prejudicial error.
 

 The inferred intent instruction
 

 2. The state requested, and the court gave, the following instruction:
 

 "There is a disputable presumption that a person intends the ordinary consequences of his voluntary acts and that an unlawful act was done with an unlawful intent. You may infer intent in accordance with this rule.”
 

 Although there is a statutory basis for part of this instruction (ORS 41.360), the Ninth Circuit several years ago declared unconstitutional a substantially identical instruction
 
 (Colson v. Cupp,
 
 449 F2d 730 (1971)); and this court said in
 
 State v. Bartolon,
 
 8 Or App 538, 495 P2d 772 (1972), that "the wise course” is not to give the instruction. Yet in this 1976 trial the instruction was requested by the state and given by the trial judge.
 

 In its brief the state acknowledges the holdings in
 
 Colson
 
 and
 
 Bartolón
 
 and concedes that "the instruction in question is perhaps inappropriate in some other types of criminal cases,” but it argues that the instruction is a proper one in a burglary in the first degree
 
 *[707]
 
 case. The argument is that "common sense” leads to a conclusion that a person using burglary tools or unlawfully entering a building very likely intends to commit a felony inside.
 

 That proposition is by no means a refutation of the reasoning in
 
 Colson
 

 [2]
 

 which is broad enough to cast doubt on the instruction in any case. Furthermore, the state’s argument contains its own rebuttal. If "common sense” is a sufficient attribute to permit the trier of fact to reason from the on-the-scene use of burglary tools or the unlawful entry into a building to the conclusion of an unlawful intent, then surely a presumption is neither needed nor helpful.
 

 We might very well hold the giving of the instruction to have been error were we not bound by the Supreme Court’s decisions in
 
 State v. Hood, 225
 
 Or 40, 356 P2d 1100 (1960), and
 
 State v. Gibbons,
 
 228 Or 238, 364 P2d 611 (1961), which approved instructions which are indistinguishable from the one in issue here. However, even if the instruction had been erroneous, it was not prejudicial. The defendant’s exception was that "it implies that the State does not have the burden of proof beyond a reasonable doubt to prove that element [i.e., intent].” We have reviewed the whole of the instructions given. We conclude that they were so clear and cogent with respect to the state’s burden of proof that there was no substantial chance of prejudice, and we will therefore not reverse the conviction.
 

 The in-custody interrogation
 

 a.
 
 The Miranda issue
 

 After his arrest, defendant was brought to the police station in downtown Portland. He was read his "Miranda rights” by Detective Staudenmaier and then
 
 *[708]
 
 signed the standard form acknowledgment of that reading. According to Detective Mettoon:
 

 "I asked him if he wished to talk about it. He stated, no, there was no sense talking about it, that we could easily put him in one burglary anyway. So consequently, we didn’t talk to him about the burglary any more.”
 

 There followed questions by Detective Staudenmaier about the car used in the getaway and a knife found on the defendant. The witness at the suppression hearing and the trial was Detective Mettoon. His memory about what Detective Staudenmaier had asked and the answers defendant had given was not at all clear, detailed or precise. Defendant claims the evidence of his statements made to the police should have been suppressed for two reasons: The state failed to prove the statements were voluntary, and the defects in Detective Mettoon’s memory deprived defendant of his right to confrontation by way of cross-examination.
 

 At this point it is helpful to summarize the factual situation surrounding the interrogation of the defendant. When he was seized by the police officers from his hiding place, he was put in the back seat of the police car. He was then read the
 
 Miranda
 
 warnings. He said that he understood them and that he did not wish to make any statement. He was then transported to the scene of the crime and from there to the police station. He did not volunteer any information. At the station he was again read his rights and he signed the acknowledgment card. He did not then appear to be under the influence of any drugs or other debilitating substance, he seemed to understand where he was, and he seemed to understand what was being said to him. He said he did not want to talk about the burglaries. Detective Staudenmaier then asked him about a particular knife and he made a statement about the knife which indicated that he had in fact been at the scene of the burglary. He made other incriminating statements about the automobile reportedly used in getting away from the scene.
 

 
 *[709]
 
 The foregoing summary is derived from the transcript of the suppression hearing, at which the following colloquy took place:
 

 "THE COURT: What statement is it that you’re trying to suppress?
 

 "[DEFENSE COUNSEL]: I would like to suppress the statements regarding the knife for one thing.
 

 * * * *
 

 "THE COURT: * * * Now what else do you want to suppress? I don’t know what conversations you are even talking about. As near as I can tell, he told the officers, T don’t want to talk about the burglaries because you bet that you could prove those without my statement.’ Now why is it that that is not admissible? He was advised of his rights and told that he didn’t have to talk, and that’s what he said.
 

 "[DEFENSE COÚNSEL]: He also indicated to the arresting officers that he did not wish to make any statements; yet, he was taken to the Detective Section for purposes of being interviewed.
 

 "THE COURT: He was then given his rights, and at that time, he apparently changed his position. I don’t see where that’s—
 

 "[DEFENSE COUNSEL]: If that’s put together with his statement that he was very much concerned about withdrawal or about his drug problem, I think that that gives an indication as to why he made some of the statements, even though he did not wish to speak.
 

 * * * *
 

 "My position is that if someone who was being interrogated by the police is very much concerned about having withdrawal and not being able to get to the downtown facilities or being able to have some help with the withdrawal problems, that that person would be more likely to just want to cooperate with the police officers so that he could get out of there, and that’s the argument, your Honor.
 

 "THE COURT: I suppose that’s a possibility. And if you had something to support it, I would buy it, but you don’t have anything to support that contention.”
 

 
 *[710]
 
 At that point the court denied suppression. However, defense counsel immediately moved to suppress any mention of the knife on the grounds that "it is totally irrelevant to the case, and it is highly prejudicial.” Further inquiry developed that the prosecution intended to use evidence concerning the knife to show that it might have been the pry tool used to open the apartment and as part of a showing that defendant had seen at least one of the two witnesses at the scene. The court then made a tentative ruling that introduction of the knife would not be permitted on the grounds that it would be inflammatory and highly prejudicial. At the trial no testimony concerning any statement about the knife was offered, nor was the knife introduced in evidence. However, testimony about the automobile was offered and received (without objection by defense counsel). The substance of the testimony was that defendant admitted that he had been driving the car and that he had borrowed it from a friend. The car was identified as the car seen at the place of the burglary. Apparently, also, subsequent to the defendant’s having stated that he did not wish to talk about the burglary, and after questions about the car, he was asked whether he would consent to a search of the car and he did so.
 

 3. We come back now to the issue as presented on this appeal. The defendant asserts that the admission of "[statements made by the defendant diming police interrogation” was. erroneous "when the State failed to prove that they were voluntary.” At the suppression hearing no issue was raised concerning the questioning about the automobile; counsel challenged only the specific questioning concerning the knife.
 

 Michigan v. Mosley,
 
 423 US 96, 96 S Ct 321, 46 L Ed 2d 313 (1975), is asserted for the proposition that "admissibility of statements obtained after the person in custody has decided to remain silent depends under Miranda on whether his 'right to cut off questioning was 'scrupulously honored.’ ” 423 US at 103. That is a fair statement of the rule derived from
 
 Mosley,
 
 but its
 
 *[711]
 
 application to this case is not so clear as defendant would have it. Defendant’s written motion to suppress covered "any and all oral statements made by the defendant and the fruits thereof.” When the matter came on for hearing, counsel limited the scope of the inquiry with respect to specific statements wholly and completely to the knife. Even though
 
 Mosley,
 
 properly applied, might have required a different ruling than the trial court made on that issue, the ruling cannot have been prejudicial error, for the knife and testimony about it was never offered.
 
 [3]
 
 In effect, the trial court suppressed the knife and testimony about it on the grounds of relevancy. The issue presented in
 
 Mosley
 
 is not before us.
 

 As to the incriminatory statement made coincidentally when the defendant told the officers he did not wish to talk about the burglary, there can be no doubt that it was volunteered.
 
 See State v. Joseph,
 
 252 Or 610, 451 P2d 468 (1969);
 
 State v. Austin, 1 Or
 
 App 556, 465 P2d 256 (1970).
 

 b.
 
 The cross-examination issue
 

 4. Detective Staudenmaier had conducted the questioning of the defendant. He was not available as a witness at the time of the trial. Detective Mettoon’s testimony consisted largely of his recollection of what his partner had said to the defendant and what the witness heard the defendant say. His recollections of events were not very clear. Defendant asserts that the trial court should have suppressed Detective Mettoon’s testimony on due process grounds because "he was impervious to cross-examination because of his poor recollection,” relying on
 
 Pointer v. Texas,
 
 380 US 400, 85 S Ct 1065, 13 L Ed 2d 923 (1965);
 
 Douglas v. Alabama,
 
 380 US 415, 85 S Ct 1074, 13 L Ed 2d 934 (1965);
 
 Chambers v. Mississippi,
 
 410 US 284, 93 S Ct 1038, 35 L Ed 2d 297 (1973); and
 
 Davis v. Alaska,
 
 415 US 308, 94 S Ct 1105, 39 L Ed 2d 347 (1974).
 

 
 *[712]
 
 One basic difficulty in defendant’s position is that all of the statements were in fact made in the presence of the defendant or by him. Detective Mettoon’s testimony about statements by Detective Staudenmaier was offered only to show that the statements were made; their truth was not in issue. Therefore, a hearsay objection to the testimony would not have been sustainable. As to the constitutional objection, we do not understand that cases relied on by defendant to say or lead to the necessary inference that the statements about what another person said in the presence of the defendant are constitutionally suspect just because the speaker is not presented as a witness. As the trial court said, the
 
 weight
 
 of Detective Mettoon’s testimony may have been lessened because of his poor recollection, but the defendant’s ability to get at the truth of what went on in the station house was not constitutionally impaired just because the witness had a weak memory. There was no error in refusing to suppress that testimony.
 

 The identification issue
 

 5. Defendant was accused of burglary in an apartment. One of the apartment’s tenants returned home to find her door broken open. Rather than enter, she went downstairs to talk to a neighbor. While they were discussing the situation, she heard someone coming down the stairs. Through a window the two women saw a man walk swiftly out the door, get into a car, and back rapidly away against one-way street signs. The victim and her neighbor both had a plain view of the driver’s face from a short distance. They were able to take down the car’s license number.
 

 The police were called and a description of the car, its license number and the driver were immediately broadcast. The driver had fled at about 2 p.m. By 2:30 Officer McGuire had spotted the car parked a few blocks away. In a few minutes the defendant approached the car walking. He looked at the marked police car and at the parked car and then walked away
 
 *[713]
 
 in the direction from which he had come. The officer followed in his car. Defendant began to run. He disappeared into an apartment house, where he was found hiding behind a refrigerator in the basement.
 

 Defendant was placed in the back seat of another patrol car and taken to the scene of the burglary. Forty-five minutes to an hour had passed since the man had been seen leaving. One of the officers asked the witnesses if they could identify the man sitting in the car as the one leaving the apartment. Both witnesses positively identified the defendant as the man who had fled, even though they both expressed some concern because he was wearing a different shirt. The witnesses were told, possibly prior to the identification, that the car with the license number they had given the police had been found a few blocks away and that a man had been found in an apartment house basement. The witnesses viewed the defendant in each other’s presence and observed and heard each other’s identification.
 

 Beginning with
 
 Stovall v. Denno,
 
 388 US 293, 87 S Ct 1967, 18 L Ed 2d 1199 (1967), and up to
 
 Neil v. Biggers,
 
 409 US 188, 93 S Ct 375, 34 L Ed 2d 401 (1972), the United States Supreme Court cases seemed to say that extra-judicial identification procedures which were "unnecessarily suggestive and conducive to irreparable misidentification”
 
 ipso facto
 
 violated due process standards.
 
 Neil
 
 said the scope of the inquiry was to determine whether the identification process, even if suggestive, was sufficiently reliable in the light of all the circumstances to satisfy due process fairness requirements. In
 
 Manson v. Brathwaite,
 
 432 US 98, 95 S Ct 2243, 53 L Ed 2d 140 (1977), the court clearly adopted the standard and the tests of reliability in
 
 Neil v. Biggers, supra,
 
 and rejected
 
 Stovall.
 

 Defendant does not argue that the witnesses’ identification was unreliable in view of all the circumstances. He argues that
 
 Stovall
 
 should apply, with the effect that, absent exigent circumstances justifying
 
 *[714]
 
 the practice, the identification process followed here should be condemned.
 
 Manson
 
 forbids that conclusion.
 

 The following excerpts from the trial judge’s ruling are relevant:
 

 "THE COURT: Well, I think that the identifications were perfectly proper. I don’t see anything impermissible suggested [sic] or tainted about it which would indicate a high likelihood of misidentification.
 

 "The ladies had a reasonable view and saw him for more than a fleeting moment, and they saw him again within a relatively brief period of time or an hour. It just seems perfectly appropriate to me.
 

 * * * *
 

 "Can you think of anything — do you see someone; and, then, within a very brief period of time, you have an opportunity to see the individual again. * * *
 

 ******
 

 "At this point in time, the individual has the greatest opportunity for correct identification. I don’t mean that he would be identified, but if he was the wrong individual, the people would be most apt to say at that point in time: no, that’s not the man, because their imaginations would not have an opportunity to wander or be confused.
 

 ******
 

 "The two witnesses are quite bright young ladies who "I think would not be misled by the fact that the individual is in custody. I think this is not — if the person that they saw was not, in their minds, the person they saw leaving the apartment, they would have readily admitted that. I don’t think they were influenced by the conditions.”
 

 The trial court was correct.
 

 The Career Criminal Unit challenge
 

 6. Defendant was prosecuted by a deputy district attorney who is a member of the Career Criminal Unit in the Multnomah County District Attorney’s office. The unit has five attorneys, an investigator, a program analyst, two legal assistants and three legal clerks. That staff of 12 persons is responsible for the
 
 *[715]
 
 prosecution, under specific criteria, of repeated offenders with the objective of maintaining a short arrest-to-trial period, substantially avoiding plea bargaining, maintaining a low dismissal rate and achieving a high rate of victim involvement in appropriate stages of prosecution and sentencing. The unit also participates actively in sentencing proceedings, probation revocations and parole revocations as an advocate of maximum punishment for defendants prosecuted by it. Defendant urges that the prosecutorial advantages possessed by this unit (the financial support for which is supplied largely or wholly by the federal Law Enforcement Assistance Administration), and its operating policies, place defendants at such an extreme disadvantage that they Eire deprived of rights guEirEmteed by the Equal Protection and Due Process Clauses of the Fourteenth Amendment to the United States Constitution. Similar contentions were denied in
 
 State v. Ingman
 
 and
 
 State v. Neal,
 
 which were Eiffirmed without opinion. 30 Or App 67, 567 P2d 151 (1977). After giving due consideration here to the reiterated arguments, we again reject the challenge to the Career Criminal Unit. In doing so we adopt the trial court’s language:
 

 "* * * So my findings are that there is a Career Criminal Unit; that it is federally funded; that it has a very valid public policy to support it; that is to protect the public from violence and repeated property crimes by people who lead a criminal life, and that the methods designed in the grant and as practiced by the District Attorney Office are nondiscriminatory.
 

 'That the classification is reasonable and that there is not a denial of due process, and that there is not a violation of equed protection of the laws. There is not a violation of the confrontation clause of the Constitution; that the Court certainly finds the defendants are deprived of a preliminary hearing which is from Em advocacy point of view great Eissistance to the defense for discovery Emd evaluation of the CEise, and that this denial of preliminary hearings is not a violation of any constitutional right.”
 

 Affirmed.
 

 [1]
 

 "[DEFENSE COUNSEL]: * * * I would also have an exception with respect to the flight instruction. I think there has been some testimony why reasonably the defendant may have been hiding behind the refrigerator or may have been running away from Detective McGuire. That is, that he had failed to return on a pass from the Oregon State Penitentiary. And that particular instruction may have given undue emphasis on the fact that it could be used to determine the guilt of the defendant. My argument is that if there is some other reason, in addition to the one particular inference which a jury could draw, if there is any other reason why a defendant in a criminal case ran away or hid, then, that instruction should not be given because it allows the Jury to draw an inference.”
 

 [2]
 

 "* * * When the lawfulness of an act depends upon the guilty intent with which the act was done, it is patently wrong to tell a jury that it can infer the requisite intent simply from proof that a defendant did the act.”
 
 Colson v. Cupp,
 
 449 F2d 730, 731 (9th Cir 1971).
 

 [3]
 

 No issue is made on this appeal concerning the search of the automobile.