Argued July 26, affirmed October 1, 1979

STATE OF OREGON,
*Respondent,*

*v.*

DARRELL ANTHONY ROBERTSON,
*Appellant.*

(No. 77-6394, CA 12963)

600 P2d 935

Robert A. Miller, Springfield, argued the cause for appellant. With him on the brief was Lively & Wiswall, Springfield.

Douglas F. Foley, Certified Law Student, Salem, argued the cause for respondent. With him on the brief were James A. Redden, Attorney General, and Walter L. Barrie, Solicitor General, Salem.

Before Schwab, Chief Judge, and Joseph and Roberts, Judges.

ROBERTS, J.

## ROBERTS, J.

Defendant appeals from his conviction of Robbery in the Third Degree. He contends that the trial court erred in denying his motion to suppress evidence seized from his automobile following a *Terry*-type[1] stop and in failing to suppress an eyewitness identification of the defendant by the victim and her son. We affirm.

Evidence at the suppression hearing revealed that at about 11:25 p.m. on the night in question Officer Martinez of the Eugene Police Department received a police radio call advising all officers of an armed robbery. The dispatcher gave the location of the robbery and described the suspects as two negro male adults, one tall and slender—approximately six feet tall—, and the other shorter and stockier. The suspects were reported to be driving an older model, white vehicle, possibly a station wagon. The dispatcher said the suspects had left by way of an alley, but did not give a direction.

Martinez proceeded northbound on a main thoroughfare, thinking that the suspects might attempt to leave town by this route. Within five to ten minutes he observed "two negro male adults in a vehicle, white in color" traveling in the opposite direction. As the officer's vehicle passed the white automobile, the two occupants "kind of nodded and smiled." He noticed that the passenger continued to turn and look at him as he passed; he further noted that the vehicle had a big window in back "that looked like it could possibly be a station wagon." Martinez turned and began to follow the vehicle and noticed that it had "possibly expired" California license plates because they were a different color than those currently being issued in that state; he could not actually see the registration date.

---

[1] *Terry v. Ohio,* 392 US 1, 88 S Ct 1868, 20 L Ed 2d 889 (1968).

Martinez radioed the dispatcher reporting the license number and advising that he had a possible suspect in the armed robbery because the vehicle generally matched the description given and was occupied by two negro male adults. He then pulled the vehicle over.

The defendant approached Martinez and volunteered that he already had several citations for expired plates and asked the officer to give him a break. While they discussed the citations, Martinez noticed that the passenger was "squirming around and looking back" and that he appeared "extremely nervous." At one point the passenger attempted to leave the car and Martinez ordered him to get back in.

Approximately ten minutes after the stop another officer arrived. The officers removed the passenger from the vehicle and frisked both suspects, finding neither weapons nor contraband. Martinez noted that the passenger was taller and thinner than the driver. Following the frisking, Martinez walked over to the car and looked in through the windows. The door to the passenger side was open and he bent over and observed a hand gun sticking out partially from under the seat. The officers then arrested the two suspects, handcuffed them and placed them in the two vehicles. The gun was seized and placed on top of the car alongside defendant's coat. Martinez testified that he had looked into the car because he had seen the passenger "squirming around and bending over."

The victim was brought to the scene of the arrest and identified the two suspects as the men who had broken into her apartment and taken money. At the suppression hearing, the victim described the robbery and testified that the shorter and stockier of the two men was wearing a green ski mask which exposed his eyes and mouth, and a dark brown plaid shirt with dark pants. She was able to describe the size and shape of the gun, although she didn't know what it was called. She said this man had spoken to her and

pointed a gun in her face. She described the other man as taller and thinner and wearing a tan jacket with a dark turtle neck and pants. The victim testified that the men had been in her apartment for 15 to 20 minutes. She said she had observed the car for three or four seconds as it was driven off and that the area around her apartment was very well lit.

The victim testified as follows about the identification which she estimated took place from 30 to 40 minutes after the robbery.

"A. When we went up there, they had the two guys in separate cars. It was the same car that I had seen, and one was in—they were both in police cars and they were handcuffed, and I got out of the car that I was in and—well, we drove by slow so I could see the two men, and I recognized them as being the ones that had just been to my apartment, and I got out of the police car and I saw the gun on top of the roof which was the same gun that I had just seen, and I saw the tan jacket and I saw the ski mask, and then I just—my son was with me, and we got back and we drove by again so I could see the two guys again.

"Q. You stated you were able to identify those two individuals.

"A. Yes.

"Q. You were positive about that identification?

"A. Yes.

"Q. When you talk about the tan jacket, which person was wearing that?

"A. The tall, thin one.

"Q. And you stated that you saw a green ski mask on top of the car; is that correct?

"A. It was in the back seat.

"Q. You looked into the back seat of the white car?

"A. (Nods head.)

"Q. And that was the same ski mask that the person was wearing?

"A. It looked like the same one, yes.

"Q. You are positive that the gun was the same one?

"A. Yes."

[475]

Following the suppression hearing, the trial court held that the stop of defendant's vehicle was lawful; that the discovery of the gun was not the result of a search but was instead a permissible "plain view" discovery; and that the circumstances surrounding the identification of the defendant by the victim were not unduly suggestive. Defendant assigns all three findings as error.

We look first at the stop of defendant's vehicle. An officer may stop and interrogate a person if he "reasonably suspects" that the person has committed a crime. ORS 131.615.[2] The quoted phrase is defined as follows by ORS 131.605(4):

> "(4) 'Reasonably suspects' means that a peace officer holds a belief that is reasonable under the totality of the circumstances existing at the time and place he acts as authorized in ORS 131.605 to 131.625."

In determining whether the stop was justified, we look to see whether the facts perceived by the officer constituted *objective cause* for the stop. *State v. Bartosz,* 34 Or App 123, 578 P2d 426, *rev den* (1978); *State v. Carter/Dawson,* 34 Or App 21, 578 P2d 790, *rev allowed* (1978). In *State v. Bartosz, supra,* a stop was upheld based upon receipt by an officer of a police dispatch that a burglary had been committed, a license check showing that a car heading out of town was not taking the most direct path to the owner's home, and the fact that the driver took a "circuitous and apparently evasive" route after noticing the officer's presence.

---

[2] ORS 131.615 provides:

"(1) A peace officer who reasonably suspects that a person has committed a crime may stop the person and, after informing the person that he is a peace officer, make a reasonable inquiry.

"(2) The detention and inquiry shall be conducted in the vicinity of the stop and for no longer than a reasonable time.

"(3) The inquiry shall be considered reasonable only if limited to the immediate circumstances that aroused the officer's suspicion."

In *State v. Denny,* 27 Or App 455, 556 P2d 719 (1976), *rev den* (1977), an officer received a dispatch telling him that a robbery had occurred and that the two suspects, one tall and one short, were possibly of Spanish origin. He was also told that they had been disguised with ski masks and were armed with a pistol. Based on the fact that the occupants of a particular car were tall and short respectively, that one took a "sneak peek" at him, and that they slowed to a crawl at his appearance, the officer stopped the vehicle. The stop was upheld, this court noting that

"If this were a general inquiry into the possibility that a crime might have been committed, then the observations of the defendant and his companion would be insufficient to justify a stop. *State v. Johnson, Wesson,* 26 Or App 599, 554 P2d 194 (1976). Where, however, the police know that a crime of serious gravity has just been committed and that quick tactical reaction is necessary to apprehend the offender, then factors which would be of marginal significance in a general investigation take on heightened importance. The question is no longer whether there is reasonable suspicion that a crime has been committed, but rather whether there is a reasonable possiblity that the person under observation is connected with the crime which the police believe to have been committed." 27 Or App at 458-59.

In the present case, within a short time after he received the dispatch, the officer spotted a vehicle roughly matching the description he had been given. The automobile was occupied by two black males who behaved somewhat apprehensively upon noticing the officer's presence. The possibly expired license plates gave the officer further reason to stop the vehicle.[3] ORS 481.265 and 481.165(2). We find that the circumstances here provided as much basis for a stop as those in either *Bartosz* or *Denny* and were sufficient in light

---

[3] Once the vehicle was stopped, the officer apparently did not check to see if the plates were, in fact, expired. However, this does not affect the fact that the possibly expired plates gave the officer a reason to stop the vehicle. *State v. Carter/Dawson,* 34 Or App 21, 578 P2d 790, *rev allowed (1978).*

of the fact that the officer in this case, like the officer in *Denny*, knew that a crime had been committed.

Defendant next contends that the trial court erred in finding that the discovery of the gun was the result of a "plain view" observation. We do not reach the plain view issue because we find there was probable cause to search.

■ The factors justifying the stop, together with Martinez's observation of the relative heights of the two men after the passenger had left the vehicle and Martinez's observation of the "squirming and bending" by the passenger, gave the officer probable cause to believe that the vehicle might contain evidence of the crime. That the vehicle could be driven away and any evidence removed in the time it would take to obtain a search warrant presented sufficient exigent circumstances to allow the officer to make the search without obtaining a warrant. *See Chambers v. Maroney,* 399 US 42, 90 S Ct 1975, 26 L Ed 2d 419 (1970); *State v. Poole,* 11 Or App 55, 500 P2d 726, *rev den* (1972) and *State v. Greene, supra.* We conclude that the gun was properly allowed into evidence.

Defendant's final contention is that the eye witness identification was conducted under suggestive circumstances and should have been suppressed.

■ In deciding whether or not the identification was admissible, we must determine whether the identification process was suggestive and if so whether it was nonetheless reliable. *State v. Classen,* 285 Or 221, 232-33, 590 P2d 1198 (1979).

We have held that on-the-scene confrontations, shortly after the crime, between witness and suspect are acceptable means of identification. *State v. McJunkin,* 27 Or App 401, 404, 556 P2d 164 (1976), *rev den* (1977). *See also, State v. Stilling,* 31 Or App 703, 712, 571 P2d 184 (1977), *aff'd* 285 Or 293, 590 P2d 1223 (1979). In this case, the fact that the men were obviously in custody, coupled with the fact that they

were the only black men present, may have rendered the identification overly-suggestive. Assuming arguendo that the process was suggestive, we find that it was nonetheless reliable and admissible.

The factors to be examined in determining whether a suggestive identification is admissible include

"* * * the opportunity that the witness had at the time to get a clear view of the persons involved in the crime and the attention he or she gave to their identifying features, the timing and completeness of the description given by the witness after the event, the certainty expressed by the witness in that description and in making the subsequent identification, and, of course, the lapse of time between the original observation and the subsequent identification. * * *" *State v. Classen, supra,* 285 Or at 232-33.

■ The facts set forth earlier in this opinion indicate that the victim was with the suspects for 15 to 20 minutes, that she had paid attention to the details of what was happening and was able to give a fairly detailed and accurate description of what defendants were wearing and their general physical characteristics as well as a general description of their automobile. The identification was made soon after the commission of the crime and the victim was able to recount what she based the identification upon and was certain that the men in custody were the men who had been in her apartment.

We find the above factors sufficient to support the trial court's decision to submit the identification to the jury.

Affirmed.