Argued and submitted March 17, affirmed August 11, 1980

STATE OF OREGON,
*Respondent,*
*v.*
ERNEST LEE WATKINS,
*Appellant.*

(C 78-12-20292, CA 14304)

615 P2d 394

[778]

Jeffrey L. Rogers, Portland, argued the cause for appellant. With him on the brief was Ransom, Rogers & Blackman, Portland.

Karen H. Green, Assistant Attorney General, argued the cause for respondent. With her on the brief were James A. Redden, Attorney General, and Walter L. Barrie, Solicitor General, Salem.

Before Schwab, Chief Judge, and Joseph, Warden and Warren, Judges.

WARREN, J.

## WARREN, J.

Defendant seeks reversal of his conviction by a jury verdict of robbery in the first degree.[1] He assigns as error the trial court's denial of his motion to suppress identification evidence and the court's failure to give his requested instruction on the lesser included offenses of robbery in the second degree[2] and robbery in the third degree.[3]

On December 20, 1978, at approximately 6:30 p.m., two black women and one black man holding a sawed-off .22 caliber automatic rifle robbed a tire store

---

[1] ORS 164.415 provides:

"(1) A person commits the crime of robbery in the first degree if he violates ORS 164.395 and he:

"(a) Is armed with a deadly weapon; or

"(b) Uses or attempts to use a dangerous weapon; or

"(c) Causes or attempts to cause serious physical injury to any person.

"(2) Robbery in the first degree is a Class A felony."

[2] ORS 164.405 provides:

"(1) A person commits the crime of robbery in the second degree if he violates ORS 164.395 and he:

"(a) Represents by word or conduct that he is armed with what purports to be a dangerous or deadly weapon; or

"(b) Is aided by another person actually present.

"(2) Robbery in the second degree is a Class B felony."

[3] ORS 164.395 provides:

"(1) A person commits the crime of robbery in the third degree if in the course of commiting or attempting to commit theft he uses or threatens the immediate use of physical force upon another person with the intent of:

"(a) Preventing or overcoming resistance to his taking of the property or to his retention thereof immediately after the taking; or

"(b) Compelling the owner of such property or another person to deliver the property or to engage in other conduct which might aid in the commission of the theft.

"(2) Robbery in the third degree is a Class C felony."

in Portland. The robbery lasted about 2 or 3 minutes. Three witnesses observed the robbery: Gene Cross and Christopher McCord, employees of the tire store, and Mariane Stites, a police officer who was seated in a patrol car across the street. When the two women left the store, Officer Stites and her partner, Officer Mosiman, chased and apprehended them about a block and a half away. The male robber escaped.

In the meantime, a few minutes after the robbery, a second police car arrived at the store. McCord described the male robber and pointed out the way he had fled. Thereupon, McCord and a police officer followed the robber's footprints in the snow for about three and a half hours. McCord subsequently returned to the tire store. Approximately four hours after the robbery, Officers Stites and Mosiman went back to the store and picked up Cross and McCord. Officer Stites advised them that the police had a possible suspect whom they wanted them to see.[4] She instructed them not to talk to each other or to talk out loud when they observed the suspect.

They drove to a location approximately one mile from the scene of the crime. When they arrived, the defendant was standing in the middle of the street, handcuffed, surrounded by four police officers, and illuminated by the headlights of several police cars. He was about 12 to 15 feet away from the police car containing Stites, Cross and McCord. Defendant was the only black man present. Officer Stites asked Cross and McCord to look at the suspect and see if they could identify him. After they observed him for a few minutes and were unable positively to identify him as the robber, Officers Stites and Mosiman drove them around the block. They got out of the car, whereupon Officer Stites took McCord off to one side to interview

---

[4] After they were apprehended, the two female accomplices implicated defendant as being their male accomplice in the robbery. Defendant was subsequently stopped for a traffic violation and held for observation. This information was then given to Officer Stites.

him, while Officer Mosiman interviewed Cross in a separate location.

After their interviews, Cross and McCord returned to the police car and were driven to the location of their first observation of defendant. At this time, Officer Stites left the police car and instructed the other officers that they could arrest the suspect for robbery based upon her own identification. Defendant was then handcuffed and seated in the back of a police car. There were no lights where he was seated, nor was any one else sitting in the back seat. The police car containing the witnesses was driven next to the one in which defendant was seated, and Cross and McCord were asked to take another look at the suspect. At this time, both Cross and McCord identified defendant as the robber. They observed defendant for approximately 1 to 2 minutes and could hear what each other was saying.

The state stipulated that at the time defendant was stopped he would have been arrested eventually or at least detained for interview purposes concerning the robbery.

Defendant filed a motion to suppress identification, challenging both testimony concerning the "show-up" and any in-court identification testimony by Cross, McCord and Stites on the grounds that the on-the-street identification procedure was unconstitutionally suggestive and that any in-court identification was tainted thereby. In denying this motion, the court made no finding that the in-court or out-of-court identifications were reliable and independent of any suggestiveness of the original procedure.

■■ The Oregon Supreme Court in *State v. Classen,* 285 Or 221, 232, 590 P2d 1198 (1979), articulated the following test:

> "* * * As a practical matter, in the context of a motion by a defendant to suppress identification evidence on the ground that it is the product of a

[781]

suggestive procedure, the decision on its admissibility involves two steps. First, the court must determine whether the process leading to the offered identification was suggestive or needlessly departed from procedures prescribed to avoid such suggestiveness. If so, then the prosecution must satisfy the court that 'the proffered identification has a source independent of the suggestive confrontation' or photographic display, *see Commonwealth v. Botelho,* 343 NE2d 876, 881 (Mass 1976)(citing cases), or that other aspects of the identification at the time it was made substantially exclude the risk that it resulted from the suggestive procedure."

In the present case, it is clear that the activity leading to the offered identification was suggestive. Moreover, in view of the imminence of defendant's arrest, the police may have needlessly departed from procedures established to prevent such suggestiveness. This conclusion, however, does not end our inquiry. We must next examine the facts and determine whether these identifications have a source independent of the suggestive confrontation.

■ In making this determination, the following factors are relevant:

"* * * These include the opportunity that the witness had at the time to get a clear view of the persons involved in the crime and the attention he or she gave to their identifying features, the timing and completeness of the description given by the witness after the event, the certainty expressed by the witness in that description and in making the subsequent identification, and, of course, the lapse of time between the original observation and the subsequent identification. These are not to be taken as a mechanical checklist of 'constitutional' facts. Obviously other facts may also be important, such as the age and sensory acuity of the witness, *see State v. Bush,* 29 Or App 315, 563 P2d 747 (1977), or a special occupational concern with people's appearance or physical features, or the frequency of his or her contacts with individuals sharing the general characteristics of the person identified, *see Manson v. Brathwaite,* 432 US

at 115. Listing these and other relevant inquiries must not distract attention from the ultimate issue whether an identification made in a suggestive procedure has nevertheless been demonstrated to be reliable despite that suggestiveness. * * *" *State v. Classen, supra* at 232-33.

In applying these factors to the present case, we will individually discuss the testimony at the suppression hearing of all three witnesses.

■ Cross testified that during the robbery his attention was fixed primarily on the male robber who was standing 3 to 4 feet away from him for about a minute. He stated that although it was dark out he got a good look at the man. However, he did not recall his initial description to the police of the male robber nor was there any other evidence submitted as to such a description. Cross testified that when he first saw defendant standing in the street with the headlights shining on him, he "wasn't quite sure because he had changed his clothes and had taller shoes on * * *." He stated, however, that he positively identified defendant as the robber when he saw him in the back seat of the other police car. He described the circumstances surrounding his second observation of defendant as follows:

"* * * * *

"A.  * * * [T]hey put him in the car and we pulled up just enough to where we could see in the back seat through the passenger window.

"Q.  Were you still sitting in the police car?

"A.  Yes.

"Q.  And did they stop the car you were — next to the police car that the defendant was sitting in?

"A.  Just a little ahead of it where we had to look back.

"* * * * *

"Q.  The man in the robbery was standing up during the robbery; wasn't he?

"A.  Yes.

"Q.  The defendant in front of the police car in the headlights was standing up?

[783]

"A. Yes.

"Q. And then he sat in the car with — just when you made the identification?

"A. In the car it was darker more adapted to the lighting at the station.

"* * * * *

"Q. * * * And how long did you look at the defendant sitting in the car then?

"A. About a minute, two minutes."

Cross testified that during this time McCord was seated next to him in the back seat and that they could hear what each other was saying.

Although this confrontation occurred shortly after the robbery, we conclude that the prosecution did not negate the substantial risk that Cross's identification of defendant was stimulated by the suggestive procedure. Thus, having failed to show an independent source of reliability, Cross's in-court and out-of-court identifications of defendant should have been suppressed. *Manson v. Brathwaite,* 432 US 98, 53 L Ed 2d 140, 97 S Ct 2243 (1977).

■ McCord testified that he was wheeling tires into the station when defendant approached him. He stated that he thought at the time that defendant was interested in buying tires and that he did not know that they had been robbed until the defendant started running away. Although it was dark at the station, he stated that he got a good look at the robber. Shortly after the robbery, McCord described the robber as a slender black man, wearing a long green overcoat. McCord testified that after seeing defendant standing in the street in the headlights:

"Well, the policewoman that talked to me took me off and asked me, she asked me what I thought and I said, Well, the height matches and the facial, you know, complexion matches and he looks like the man. You know definitely? They didn't have a man that was 180 pounds, you know, four and a half feet tall, they had a man, you know, that looked like the

robber. And then I told her, you know, that I thought that he looked like the man."

He stated that he did not remember seeing a mustache on the robber (defendant had a mustache). However, upon subsequently seeing defendant in the back seat of the police car, McCord testified:

"A. Then we drove back down to where we had seen the man in the road, and they transferred him into the police car, and we got to sit there for about a minute, and he was sitting in the back of the police car and there was a dark shadow cast across his face and he looked more like the man at that time period than with the two car lights shining into his face. * * *

"Q. At the time did you identify him as the person who robbed the store, the station?

"A. Yes, I did.

"Q. Did you tell the police officer that?

"A. Yes, I said that looked — I said that looks more like the man that did do the robbery than when he was standing in the middle of the road. I don't know if I definitely told them that is the man. In my own mind I felt that was the man. * * *"

Here too, we conclude that the state did not carry its burden of proving that the identification by McCord has a source independent of the suggestive confrontation. Accordingly, McCord's in-court and out-of-court identifications of defendant should have been suppressed.

■ Turning to Officer Stites' identification, she testified at the suppression hearing that, while on routine patrol, her attention was drawn to the scene at the tire store because she had heard in a previous broadcast that a robbery had occurred at another location in which several blacks were involved. She stated that she had a good look at the male robber from her position inside the police car, which was parked across the street from the tire station. She stated that after the robbery she described the male robber as a black male, five feet ten inches tall, slim, with a mustache,

[785]

wearing a hat and long clothes, and going in a certain direction of travel. She testified that when she saw defendant standing in the street with the headlights shining on him she was confident that he was the man she saw at the tire station during the robbery. She testified:

> "Oh, that I had no problem identifying the subject. . Ah, the time between the time I saw the robbery and the time I saw the subject standing in the middle of the street was short enough and the memory of his face was fresh enough in my mind I had no trouble making the identification. The guy that was standing in the middle of the street was the guy standing in the gas station lot when the robbery took place."

We conclude that Officer Stites' recollection of defendant was independent from the suggestive confrontation. Moreover, as a police officer with eleven years of experience, she has a special occupational concern with a person's identifying characteristics. Hence, defendant's motion to suppress Officer Stites' identification was properly denied.

■ Although we have concluded that the identifications by witnesses Cross and McCord should have been suppressed, we must still determine whether their use at trial was reversible error. In light of the identifications of defendant by Officer Stites and the two accomplices, together with numerous items of evidence connecting defendant with this robbery,[5] we

---

[5] Defendant was identified as the male robber by both Officer Stites and the two accomplices. The two accomplices testified that the rifle found by the police was the same weapon used by the defendant. Cross testified that this rifle was the identical weapon used by the male robber. Cross, McCord, Stites and the two accomplices testified that the overcoat and cap found by the police were the same type worn by the male robber. Also, after defendant was arrested a search warrant was obtained to search defendant's residence for the distinctive type of shoes worn by the male robber. Upon searching defendant's house, the police found a wet pair of shoes matching the description that had been given. These shoes were admitted into evidence and were identified by Cross, McCord, and one of the accomplices. Moreover, the officer who tracked the suspect's footprints in the snow stated that these shoes were comparable with the footprints he found in the snow.

conclude that reversible error was not committed. The evidence of defendant's guilt was overwhelming.

In his second assignment of error, defendant contends the trial court erred in failing to give his requested instructions on the lesser included offenses of robbery in the second degree and robbery in the third degree.

ORS 136.460 provides:

"Upon a charge for a crime consisting of different degrees, the jury may find the defendant not guilty of the degree charged in the accusatory instrument and guilty of any degree inferior thereto or of an attempt to commit the crime or any such inferior degree thereof."

ORS 136.465 provides:

"In all cases, the defendant may be found guilty of any crime the commission of which is necessarily included in that with which he is charged in the accusatory instrument or of any attempt to commit such crime."

As we stated in *State v. Thayer,* 32 Or App 193, 195, 573 P2d 758 (1978):

"To be a 'lesser included' offense under these statutes, the offense which a party wishes to be submitted to the trier of fact must be either included within the statutory definition of the principal offense or actually alleged in the charging instrument. * * *'"

If either one of these is present, then:

"The *single limitation* on the right of either the prosecution or the defendant to request lesser included offense instructions under these statutes *is that there must be evidence, or an inference which can be drawn from the evidence, which supports the requested instruction so that the jury could rationally and consistently find the defendant guilty of the lesser offense and innocent of the greater. * * *' State v. Washington,* 273 Or 829, 836, 543 P2d 1058 (1975). (Emphasis supplied.)

This test was reaffirmed by the Supreme Court in *State v. Palaia,* 289 Or 463, 614 P2d 1120 (1980).

■ The state contends that the trial court did not err in failing to give defendant's requested instructions on second and third degree robbery because they were totally inconsistent with his defense of alibi. It is the state's position that defendant could not consistently claim that he was not the man who committed the robbery and also claim that the gun he used in the robbery was not a deadly weapon. We rejected this argument in *State v. Thayer, supra,* where we held that a defendant may request an instruction on a lesser included offense even though his main argument is that he did not commit the crime.

Thus, we turn to examine whether there was evidence or an inference which would support defendant's requested instructions.

■ During the trial there was testimony that the male robber carried a firearm. Cross saw the robber pull a sawed-off .22 caliber automatic rifle from under his coat, hold the muzzle out about three inches, threaten him, and then drop it back in his coat. McCord never saw a weapon.

A police officer testified that, while tracking the robber's footprints in the snow, he found a loaded, sawed-off .22 caliber automatic rifle, together with a hat and overcoat,[6] in some bushes next to a house.

The rifle and its ammunition were introduced into evidence by the state at trial. Cross identified this rifle as the identical weapon used by the male robber. The two female accomplices also identified the sawed-off .22 caliber automatic rifle as the same gun defendant used at the robbery.

In addition, the trial court instructed the jury:

---

[6] The hat and overcoat were identified at the trial by Cross, McCord, and Stites as the same type worn by the male robber.

> "When robbery is committed by threatening the intended victim with a firearm within firing range, you may infer that the weapon was loaded."[7]

Defendant maintains that the jury could rationally and consistently have found that defendant committed the robbery but that the evidence did not support a finding that the rifle he allegedly carried was "presently capable of causing death or serious physical injury," i.e., was a deadly weapon as defined by ORS 161.015(2).[8] He argues that the jury could have decided that the testimony was insufficient to prove the gun introduced was the gun carried by the robber. He contends if that had been the jury's conclusion, they would have been left with no evidence that the gun was loaded, other than a permissive inference from its use during the robbery.

We reject this argument and conclude that under the facts of this case a jury could not rationally and consistently find defendant guilty of the lesser offenses of second or third degree robbery. Cross and the two accomplices identified the weapon introduced into evidence as the identical gun used by the male robber. Shortly after the robbery, the police found the weapon with three live cartridges inside. Thus, the weapon was "presently capable of causing death or serious physical injury." ORS 161.015(2); *see State v. Vance, supra;* Commentary to Proposed Oregon Criminal Code of 1971, 2-3, § 1 (1975).

---

[7] A similar instruction was held proper in *State v. Vance,* 285 Or 383, 591 P2d 355 (1979).

[8] ORS 161.015(2) provides:

"As used in chapter 743, Oregon Laws 1971, and ORS 166.635, unless the context requires otherwise:

"* * * * *

"(2) 'Deadly weapon' means any instrument, article or substance specifically designed for and presently capable of causing death or serious physical injury."

We hold that the trial court properly refused to give defendant's requested instructions on lesser included offenses.

Affirmed.