Argued and submitted August 10, 1981, reversed and remanded
for trial March 22, reconsideration denied April 27,
petition for review denied May 18, 1982 (293 Or 146)

STATE OF OREGON,
*Appellant,*

*v.*

ROBERT ALAN DAVIE,
*Respondent.*

(No. 80,1902, CA A20188)

642 P2d 680

Barbara Jacobson, Certified Law Student, Salem, argued the cause for appellant. With her on the brief were Dave Frohnmayer, Attorney General, William F. Gary, Solicitor General, James E. Mountain, Jr., Assistant Attorney General, and Jennifer Wieland, Certified Law Student, Salem.

Douglas W. Moore, Albany, argued the cause for respondent. With him on the brief was Coady & Moore, Albany.

Before Richardson, Presiding Judge, and Thornton and Van Hoomissen, Judges.

VAN HOOMISSEN, J.

## VAN HOOMISSEN, J.

The state appeals a pretrial order suppressing evidence. The issue is whether the in-court and out-of-court identifications of defendant and his voice by three witnesses were properly suppressed as fruits of an unnecessary and impermissibly suggestive identification procedure.

Sometime between 2 a.m. and 3 a.m. on August 25, 1980, a male intruder entered the Martinson home in Brownsville. Fawna Martinson, age 8, was awakened from her sleep by the intruder, whose hand was on her leg underneath her nightgown. Light from the kitchen entered the room through a partly open door. Fawna pushed the hand away and asked where her mother was. The man answered "in her bedroom" and then walked out of her room. Fawna then fell back asleep. Fawna's mother, Dana Martinson, sleeping in an adjoining room, awakened. Propping herself up in bed, she watched the bedroom door for a few seconds until a man appeared in the doorway and entered her room one or two steps. She saw him in "very good light" coming from the kitchen and by moonlight coming in the living room windows and the bedroom windows, which had no curtains. She said: "Hey, what are you doing"? After a pause the man replied, "Oh nothing, I am just going to bed," and then backed out of the door. William Melies, who was in bed with Dana, heard the intruder's voice but did not see him. The intruder then ran from the home.

After the intruder left her home, Dana went to a nearby residence where her daughter Dawn was babysitting. After hearing Dana's description of the intruder, someone suggested the intruder might be defendant. Dawn also commented that the description matched that of a person she had spoken to near her home on the preceding day. Dana immediately returned home and called the sheriff.

Deputy Jegglie arrived at the Martinson home about 3:52 a.m. Outside Fawna's presence, he obtained a description of the intruder from Dana. She described the intruder as being approximately 6 feet tall, weighing 160 to 180 pounds, with blonde, shoulder length hair, in his early

twenties, and wearing a red baseball cap, white T-shirt, Levi's and a heavy dark jacket. Jegglie was also informed that defendant might be the intruder. He then talked with Fawna, who gave essentially the same description, except that she said the intruder had on a red and white baseball cap. Neither Fawna nor Dana was able to describe the facial features of the intruder.

Shortly before 8:00 a.m. on that day, Jegglie located defendant at work. At that time defendant was dressed in a white T-shirt and Levi's and was wearing a red and white baseball cap. He had blond, shoulder length hair, was about 6 feet tall and weighed about 180 pounds. Jegglie also observed that defendant had a heavy, dark jacket in the back seat of his car, which was parked nearby. Jegglie testified at the suppression hearing that defendant "fit the description * * * provided by [Dana] Martinson and Fawna." No claim has ever been made that defendant did not fit that description.

Jegglie advised defendant of his *Miranda* rights and about the incident at the Martinson home. Defendant denied having anything to do with it and stated that he had been drinking in the Brownsville area with two companions the previous evening. He acknowledged that he had been working a short distance from the Martinson's home the day before and that he had spoken with the Martinson girls that day. At Jegglie's request, defendant accompanied him back to the Martinson home in a marked police car to see if the persons there could identify him. Defendant was not under arrest at that time.

Shortly before Deputy Jegglie and defendant arrived at the Martinson home, Dana received a telephone call advising her that "there was a Deputy bringing over a suspect." When Jegglie and defendant arrived at the Martinson home at about 8 a.m., defendant remained in the front seat of the car while Jegglie talked with Deputy Kaufman, who arrived behind them in a marked police car. Both officers were in uniform. When the deputies and defendant arrived at the Martinson home, Fawna, Dana and Melies were inside. All three came outside, but Fawna was told by her mother to go back inside, and she did so. Jegglie said to Dana and Melies, "I got the guy in the car"

and that one of the officers was going to look around in back of the house. After Deputy Kaufman had gone to the back of the house and returned, he spoke to Jegglie. Jegglie then returned to his patrol car and escorted defendant to the back of the house. At this time defendant passed within 10 or 15 feet of Dana, and she recognized him as the intruder. She testified at the suppression hearing that when the officers escorted defendant to the rear of the house she "was wondering why he didn't have handcuffs on then because I knew he was the person that was in the house."

After comparing defendant's footprints with the footprints found in the rear of the residence, the officers arrested defendant and handcuffed him. He was then escorted back to the police car, and on the way he was again taken within a few feet of Dana and Fawna, who had joined her mother outside, and Melies. They were informed that the deputies thought the footprint found in the rear of the house matched defendant's. At that time Dana and Fawna indicated to the police that defendant was the intruder. Defendant then exclaimed: "I didn't do it!" Dana then said she recognized defendant's voice as that of the intruder. Melies testified at the suppression hearing that he, too, recognized defendant's voice as the same voice he had heard earlier, although it is not clear from the record whether he conveyed that information to the officers at that time. The trial court made the following finding:

> "Any incourt identification of Robert Davie or any subsequent identification of Mr. Davie by Fawna or Dana Martinson or William Melies cannot be based upon any source independent of the impermissibly suggestive confrontation that occurred at approximately 8:00 o'clock a.m. on August 25, 1980."

■ The state first contends that the identification procedure here was permissible under the well-established rule that on-the-scene identifications shortly after a crime are lawful. *State v. Robertson,* 42 Or App 471, 600 P2d 935 (1979); *State v. Stilling,* 31 Or App 703, 571 P2d 184 (1977), *aff'd* 285 Or 293, 590 P2d 1223, *cert den* 444 US 880 (1979); *State v. McJunkin,* 27 Or App 401, 556 P2d 164 (1976), *rev den* 277 Or 1 (1977); *State v. Madden,* 1 Or App 242, 461 P2d 834 (1969), *rev den, cert granted* 400 US 901 (1970),

*aff'd* 406 US 404, 92 S Ct 1628, 32 L Ed 2d 184 (1972). Defendant contends that the identification procedure here was unnecessary[1] and impermissibly suggestive. *Stovall v. Denno,* 388 US 293, 302, 87 S Ct 1967, 18 L Ed 2d 1199 (1967); *State v. Classen,* 285 Or 221, 232, 590 P2d 1198 (1979). In *Robertson,* we held that:

> "* * * Assuming arguendo that the [identification] process [which occurred 30 to 40 minutes after an armed robbery] was suggestive, we find that [the identification] was nonetheless reliable and admissible." 42 Or App at 479.

In *Stilling,* we held that eyewitness identifications made forty-five minutes to an hour after the witnesses had observed a man leaving the scene of a burglary were reliable despite an arguably unnecessary and impermissibly suggestive identification procedure. In *McJunkin,* the police took the nine-year old victim of an attempted rape to the home of the defendant about thirty minutes after the incident, and she then identified him as the culprit. Six months later, and one day before the trial, the child was shown five photographs of different men from which she selected defendant's photograph. At trial, defendant objected to the introduction of the photographs on the ground that the process of identification was unduly suggestive. That objection was overruled. The child then identified defendant again. Her in-court identification was not challenged, and defendant made no contention on appeal that the in-court identification was tainted by the pretrial photographic identification procedure. Rather, he argued, the face-to-face identification procedure followed by the police on the day of the alleged crime tainted any subsequent photo lineup. We held that "neither the [on-the-scene] procedure followed nor the series of photographs used was impermissibly suggestive." 27 Or App at 404. Finally, in *Madden,* we held that an on-the-scene confrontation between witnesses and the defendant who was under arrest and wearing handcuffs and which occurred about thirty minutes after an armed robbery was permissible.

---

[1] The defendant argued that the procedure was unnecessary because he had substantial ties to the community and that therefore he was not likely to run. The evidence indicates that defendant grew up in Brownsville and then moved away. He and his wife and her children moved to Brownsville about a year prior to the incident and were buying a home there. He had been working at Thompson's Mill in Shedd, six miles from Brownsville, for about seven months.

■ We agree with the trial court's conclusion that the identification procedure described here was both unnecessary and impermissibly suggestive. We, therefore, address the issue whether under the totality of the circumstances, the identifications were nevertheless reliable and therefore admissible at trial. *Manson v. Brathwaite,* 432 US 98, 97 S Ct 2243, 53 L Ed 2d 140 (1977); *Neil v. Biggers,* 409 US 188, 93 S Ct 375, 34 L Ed 2d 401 (1972); *State v. Classen, supra; see also, United States v. Crews,* 445 US 463, 100 S Ct 1244, 63 L Ed 2d 537 (1980).[2] The state bore the burden of proving that the identifications were based on a source independent of the suggestive confrontation. *United States v. Crews, supra; Silverthorne Lumber Co. v. United States,* 251 US 385, 40 S Ct 182, 64 L Ed 319, 24 ALR 1426 (1920); *State v. Classen, supra; State v. Watkins,* 47 Or App 777, 785, 615 P2d 394 (1980). We accept the historical factual findings made by the trial court. However, we are not bound by its *conclusion* drawn from those facts, if we believe they do not support that conclusion. *State v. Warner,* 284 Or 147, 156, 585 P2d 681 (1978); *Ball v. Gladden,* 250 Or 485, 487, 443 P2d 621 (1968).

In *State v. Classen, supra,* the Supreme Court said:
"*** in the context of a motion by a defendant to suppress identification evidence on the ground that it is the product of a suggestive procedure, the decision on its admissibility involves two steps. First, the court must determine whether the process leading to the offered identification was suggestive or needlessly departed from

---

[2] In *United States v. Crews,* 445 US 463, 477, 100 S Ct 1244, 63 L Ed 2d 537 (1980), the United States Supreme Court held that, because the witness' in-court identification was based upon independent recollections of defendant, the identification was properly admitted, even though a pretrial identification by the same witness was inadmissible.

"A victim's in-court identification of the accused has three distinct elements. First, the victim is present at trial to testify as to what transpired between her and the offender, and to identify the defendant as the culprit. Second, the victim possesses knowledge of and the ability to reconstruct the prior criminal occurrence and to identify the defendant from her observations of him at the time of the crime. And third, the defendant is also physically present in the courtroom, so that the victim can observe him and compare his appearance to that of the offender. * * *" 445 US at 471.

In this case none of these three elements "has been come at by exploitation" of the violation of defendant's constitutional rights. *Wong Sun v. United States,* 371 US 471, 488, 83 S Ct 407, 9 L Ed 2d 441 (1963).

procedures prescribed to avoid such suggestiveness. If so, then the prosecution must satisfy the court that 'the proffered identification has a source independent of the suggestive confrontation' or photographic display, * * * or that other aspects of the identification at the time it was made substantially exclude the risk that it resulted from the suggestive procedure.

"It is in making this second determination that facts of the kind mentioned by the [United States] Supreme Court in *Manson v. Brathwaite,* are relevant * * *." (Footnote omitted.) 285 Or at 232.

The features of reliability recognized in *Brathwaite* and *Classen* include: (1) the opportunity that the witness had at the time to get a clear view of the person involved in the crime; (2) the attention the witness gave to the person's identifying features; (3) the completeness of the description given by the witness after the event; (4) the certainty expressed by the witness in that description and in making the subsequent identification; (5) the lapse of time between the original observation and the subsequent identification; and (6) other important facts, such as the age and sensory acuity of the witness, or a special occupational concern with people's appearance or physical features, or the frequency of the witnesses' contacts with individuals sharing the general characteristics of the person identified.

Here, Dana was awake before the intruder appeared in her doorway. She saw him in "very good light" coming from the kitchen and by moonlight coming through the windows in the living room and her bedroom. Although the intruder was in her bedroom for not more than 20 seconds, she was alert and her attention was focused on him. Although she could not make out his facial features, she was able to give Deputy Jegglie a detailed description of his physical characteristics and clothing. She recognized defendant immediately when he stepped out of the police car and before the officers brought him from the back of the house in handcuffs, when she again identified him. That identification took place within a few hours after the incident. She also recognized his voice when he spoke. She was "certain" defendant was the intruder.

Fawna also had an adequate opportunity to view the intruder. Light was coming into her bedroom from the

kitchen. The man was close enough to touch her body. She, too, was able independently to give Deputy Jegglie a detailed description of his physical characteristics and clothing. She had seen defendant for several minutes the day before. Her identification likewise occurred only a few hours after the incident and was made in positive terms.

In *State v. Robertson, supra,* we affirmed the trial court's decision to submit the identification to the jury when the witness had been with the suspects for fifteen to twenty minutes and was able to give a fairly accurate and detailed description of defendants's clothing and general physical characteristics. Here, as in *Robertson,* the identifications were made shortly after the crime, and the witnesses were able to recount the independent basis for their identification.

The trial court apparently reasoned that, because neither Dana nor Fawna could recall the intruder's *facial* features, their identification of defendant was unreliable.[3] While failure to recognize a suspect's face is a factor in determining reliability, it is not dispositive. If it were, a blind victim could never identify a suspect even though the suspect had a distinctive voice, characteristic or mannerism of which the blind victim became aware by use of senses other than sight. In *Robertson,* the witness could see only the defendant's mouth and lips because a ski mask obscured the rest of his face. Similarly, in *State v. Ott,* 54 Or App 309, 634 P2d 825, *rev den* 292 Or 334 (1981), identifications of two suspects were found reliable even though each suspect wore a mask concealing his nose and mouth. Here, although Dana and Fawna were unable to describe the intruder's facial features, they were able to give detailed descriptions of his general physical characteristics and clothing.

Considering the totality of the circumstances, we do not agree with the conclusion drawn by the trial court from the historical facts that any identification of defendant by Dana or Fawna could not be based upon a source of

---

[3] In its memorandum opinion, the trial court stated:

"Since neither Fawna or Dana ever saw the intruder's face or could identify him thereby, or by other than general size, shape and clothes, their identification of the defendant cannot be based upon any source independent of the suggestive confrontation."

information independent of the suggestive confrontation. We conclude that Dana and Fawna possessed "knowledge of and the ability to reconstruct the prior criminal occurrence and to identify the defendant from their observations of him at the time of the crime," *United States v. Crews, supra,* 445 US at 471, and that their identifications are, therefore, reliable. *See State v. Lee,* 56 Or App 147, 641 P2d 589 (1982). Their credibility as witnesses and the weight to be given their testimony remain questions for the jury. *State v. Classen, supra,* 285 Or at 233. It was reversible error for the trial court to suppress those identifications.

■ The reliability of the Melies' identification of defendant's voice is another matter. He testified at the suppression hearing that he did not see the intruder and that the only words he heard him speak were: "Oh, nothing. I am going to go to bed." When Jegglie brought defendant to the Martinson home, Melies was present. He witnessed the identification procedure we already have found unnecessary and impermissibly suggestive. Before he recognized defendant's voice, he knew that Dana and Fawna had identified defendant as the intruder. He heard the police say that defendant's footprint matched one they had found in the back of the house. He saw defendant was under arrest and in handcuffs. Melies heard defendant say only "I didn't do it." Those few words constituted his sole basis for his identification of defendant's voice. There is nothing in the record to indicate that the voice Melies first heard or defendant's voice was in any way distinctive or unusual.

Considering the totality of the circumstances, we agree with the conclusion reached by the trial court that any identification of defendant's voice by Melies could not be based upon any source of information independent of the impermissibly suggestive procedure. Without more, the few words he heard provide no basis for concluding with any degree of confidence that his identification was reliable, notwithstanding the suggestive procedure.[4]

---

[4] We do not mean to suggest that the voice identifications generally are unreliable. *See State v. Carcerano,* 238 Or 208, 218, 390 P2d 923 (1964), *cert den* 380 US 923 (1965); *State v. Lee,* 56 Or App 147, 641 P2d 589 (1982); *see also Simmons v. United States,* 390 US 377, 88 S Ct 967, 19 L Ed 2d 1247 (1968).

Therefore, the trial court properly suppressed the identification made by him.[5]

Reversed and remanded for trial.

---

[5] A court may order a person to speak to demonstrate his voice for purposes of identification. Such evidence, not being testimonial in nature, does not violate the privilege against self-incrimination. *State v. Medenbach,* 48 Or App 133, 138-39, 616 P2d 543 (1980); *State v. Reynolds,* 43 Or App 619, 624, 603 P2d 1223 (1979), *aff'd* 289 Or 533, 614 P2d 1158 (1980); *see also United States v. Dionisio,* 410 US 1, 93 S Ct 764, 35 L Ed 2d 67 (1973); *Wise v. United States,* 383 F2d 206, 127 ADC 279, 24 ALR 3d 1255 (DC Cir 1967), *cert den,* 390 US 964 (1968). In such event, in the context of this case, the witnesses' in-court voice identification would be subject to the same considerations affecting the admissiblity of his out-of-court identification, *i.e.,* is the in-court identification the product of the impermissibly suggestive out-of-court identification, and, if it is, is it nevertheless reliable?