Argued and submitted September 16, 1981, affirmed March 8, 1982

## STATE OF OREGON,
*Respondent,*

*v.*

## MARTIN CARTER LEE,
*Appellant.*

(No. C80-05-31847, CA A20273)

641 P2d 589

John Daugirda, Deputy Public Defender, Salem, argued the cause for appellant. With him on the brief was Gary D. Babcock, Public Defender, Salem.

James E. Mountain, Jr., Salem, argued the cause for respondent. With him on the brief were Dave Frohnmayer, Attorney General, and William F. Gary, Solicitor General, Salem.

Before Richardson, Presiding Judge, Joseph, Chief Judge, and Van Hoomissen, Judge.

JOSEPH, C. J.

## JOSEPH, C. J.

Defendant appeals his convictions for rape in the first degree, ORS 163.375, and burglary in the first degree, ORS 164.225, contending that the trial court erred in denying his motion to suppress in-court and out-of-court photographic and voice identifications made by the rape victim's sister.

During the day on January 21, 1979, a man came to Victoria Voglund's house and asked if she had seen his dog. She replied that she had not but, if he would leave his telephone number, she would contact him in the event she did. He said he did not have a telephone and would check back within a week. A week later, he returned to the house and again asked about the dog. Ms. Voglund testified that she was a little surprised that he had returned. When she said that she had not seen the dog, he turned to go but then asked to use the telephone to call a taxi. She let him in, pointed to the telephone in the kitchen and went upstairs to continue her cleaning. After a "little while," he came to the top of the stairs to ask for the address of the house. He then went downstairs and, after a few minutes, told Ms. Voglund from the foot of the stairs that the taxi would arrive in about 15 minutes and asked if he could wait inside. She replied that she would be uncomfortable if he did, and he left.

At about 12:45 on the morning of February 2, 1979, Ms. Voglund's sister, Michelle, who was staying alone in the house that night, awoke to hear someone coming up the stairs to the second floor where she had been sleeping. Michelle feigned sleep for nearly half an hour as the intruder walked back and forth several times from the bathroom to the side of her bed. The bathroom and hall lights were on, and she caught several glimpses of the man. He then stood by the bed and told her that he was going to rape her and that he had a knife. During the rape, she kept her eyes closed. When the victim asked whether he knew her, he said that he had seen her walking and that his name was Larry Hart. She told him her first name. Afterwards, he stood back from the bed, covered her up with the bedclothes, kissed her on the cheek and apologized. After he left, the victim looked out the window

and saw and heard a loud, large, dark, older model car slowly drive down the street.

Michelle contacted the police shortly after the incident and described her assailant as 24 to 25 years old, fair complexion, 5' 11" stocky, weighing around 200 pounds and wearing a ski mask and a dark heavy coat.[1]

Later that day, Ms. Voglund received two telephone calls from a man whose voice, according to her testimony, she recognized as that of the man who had inquired about the dog. He asked for the victim by name. In the first call, when told she was not there, he refused to leave his number but said he would call back. During the second call, he identified himself as Larry Hart.

The next evening, both women were at Ms. Voglund's house, and they heard a noisy car. The victim thought it was the same one she had heard and seen after the rape. Shortly thereafter, there was another call, and the man spoke with the victim, who recognized the caller's voice as that of her assailant. He apologized for what had happened and wanted to know if there was any way they could get together. She said there was not. Within five minutes, the same noisy car drove past the house.

On March 1, 1979, Ms. Voglund, who was emerging from her car at a hamburger stand in southeast Portland, heard a car and looked up to see that it was a large, older greenish-blue Oldsmobile.[2] She got a "good look" at the driver, whom she claimed to recognize as the man with the supposedly missing dog, and made "mental notes" about the car. She then called the police and described him as a short, 25-year-old white male, of slender build and with dark curly hair and a mustache.[3]

---

[1] Defendant testified he is 5' 7" weighed 150 pounds and had a mustache in 1979. He was 26 at the time of his arrest.

[2] Her testimony at trial conflicted with her testimony at the hearing with respect to *when* she saw and heard the car. At the hearing, she testified that she followed the defendant into the lot of the hamburger stand. At trial, she stated that she was in the lot already when she heard and saw the car arrive.

[3] At the hearing on the motion to suppress, Ms. Voglund testified that on February 23, 1979, she was assaulted in her home by a man with a mallet. She

The following day, the women were asked to come to the police station for a photographic throw-down identification. The two had earlier discussed the "suspicious man" who had inquired about the dog, and Ms. Voglund described him to her sister as a white male with short, dark curly hair. At the station, the women separately were shown six color photographs of young men with mustaches. Both selected defendant's photograph. On April 3, 1979, the women were again called to the station for a voice identification. They separately were played six recordings of voices. Both selected the recording of defendant's voice.

Defendant moved to suppress the in-court and out-of-court photographic and voice identifications by both witnesses on the grounds that the identification procedures were suggestive and the identifications unreliable.[4] The trial court granted the motion with respect to Michelle, because her out-of-court identification of defendant was the result of an "unduly suggestive" procedure and was unreliable[5] and her in-court identification was not shown to

---

described her assailant to the police as a 22 to 23-year-old man, 5' 5" to 5' 6" weighing 160 pounds and wearing a dark blue ski mask. It is not clear when she contacted the police or when the description was given. She testified that she suspected that her assailant was the same man who had visited her house in regard to the lost dog and who had raped her sister. However, the trial court ruled this testimony of "other crimes" inadmissible at trial.

[4] At the hearing on the motion to suppress, defense counsel inquired into the necessity of the procedures used by the police and whether or not the procedures were routine or established police practice, but he did not base his motion to suppress on those issues.

[5] The trial court based its finding of unreliability on the following facts:

(1) The rape victim's opportunity to see the victim was limited.

(2) Her description of her assailant did not fit defendant.

(3) She had had conversations with her sister about the "suspect" prior to the identification.

(4) The degree of certainty with which she identified defendant was not great.

(5) The time lapse between the crime and the identification was substantial.

(6) She was told by the police that the suspect's picture and recorded voice would be among the identification samples.

The court considered the last to be particularly significant.

have a source independent of the out-of-court identification. The court denied defendant's motion with respect to Ms. Voglund.[6]

■ In determining whether to admit evidence of an out-of-court identification, the court must first decide whether the identification procedure was impermissibly suggestive. *State v. Classen,* 285 Or 221, 232, 590 P2d 1198 (1979). If that finding is made, the court must then determine whether the identification has a "source independent of the suggestive confrontation" or that

> "* * * other aspects of the identification at the time it was made substantially exclude the risk that it resulted from the suggestive procedure." *State v. Classen, supra,* 285 Or at 232.

In other words, evidence of an out-of-court identification is admissible if the state has shown that the identification is *reliable* despite the suggestive *procedure;* that is, that defendant was not chosen *because of* the suggestive procedure.[7]

■ ■ We disagree with the trial court's conclusion that the photographic throw-down and voice identification process were not suggestive. Of the six photographs shown the witness, only defendant's fit the general description given by her to police; defendant's was the only picture of a white man with short, dark curly hair. *See State v. McBain,* 24 Or App 737, 739, 547 P2d 188, *rev den* (1976). Of the six voice recordings,[8] only that of defendant's voice was recorded

---

[6] The court stated:

> "I do conclude as far as Victoria is concerned, that applying the totality of the circumstances test where reliability — whether or not the identification procedure was reliable, set forth in *Manson* or applying the test of *State v. Classen,* I am of the view that the out-of-court identifications of the defendant by Victoria are reliable, were not the product of unduly suggestive procedures, didn't violate the defendant's due process rights or other rights and likewise her in-court identification was a product of an independent source or memory of the events that she saw the defendant on January 21st and 28th, 1979, and also in March at the A & W."

[7] The general approach and policy considerations for testing the reliability of *voice* identifications are the same as for photographic identifications, although the factors are not necessarily the same. *See United States v. Pheaster,* 544 F2d 353, 369-370 (9th Cir 1976), *cert den* 429 US 1099.

[8] One of the six tapes was erased by a police officer after the identifications were made. Therefore, there were only five recordings played at the hearing.

over the telephone and contained background noise. The tape of defendant's voice was part of a recording of a telephone conversation he had with police. The other five tapes were made by police officers — all considerably older than defendant[9] — reading a transcription of that conversation. As a result, defendant's voice sounds the most natural. Contrary to the view apparently held by the trial court, the fact that the witness Voglund was not told that the suspect was among the samples is not determinative on the issue of suggestiveness. See State v. Bush, 29 Or App 315, 318, 563 P2d 747 (1977).

■ Nevertheless, we agree with the trial court's conclusion that Ms. Voglund's out-of-court identifications of defendant were reliable. The witness had at least two face-to-face encounters with the suspicious man. The second was noteworthy because of her surprise that he had returned to her house. She conversed with him for five minutes on her porch the first time, and the second encounter lasted approximately 10 minutes. At the hamburger stand, she took special note of his appearance. Her description of the man fit defendant and was not so general as to suggest that it was contrived or that the witness was inattentive or lacked opportunity to observe him. The voice of the man who telephoned after the rape was recognized by Ms. Voglund to be the same as that of the man with the lost dog and that of defendant later.[10] The identifications were not so remote in time from the original encounters to suggest untrustworthiness.

Affirmed.

---

[9] Two of the officers were 54 years old. The others ranged in age from 32 to 38.

[10] Defendant argues that Ms. Voglund's statement with respect to the certainty of her voice identification of defendant that "I was not entirely sure but I was as sure as I possibly could be on a voice recording" is evidence that her identification was unreliable. However, we construe the witness' statement to be her recognition that no voice recording is as reliable as some other method of identification. Nevertheless, the appropriate question is not whether voice recordings are ever reliable but whether the identification based on these particular recordings was significantly more unreliable than others. See State v. Carcerano, 238 Or 208, 390 P2d 923 (1964); United States v. Pheaster, supra; United States v. Basey, 613 F2d 198 (9th Cir 1979); United States v. Dupree, 553 F2d 1189 (8th Cir 1977); United States v. James, 494 F2d 1009 (DC Cir 1974); United States v. Otero-Hernandez, 418 F Supp 572 (MD Fla 1976).