Argued and submitted November 7, 1996, affirmed September 24, 1997, petition for review denied February 10, 1998 (326 Or 464)

# STATE OF OREGON,
*Respondent,*

*v.*

# RYAN NAJIBI,
*Appellant.*

## (93CR2755FE; CA A90539)

945 P2d 1093

Robert J. McCrea argued the cause for appellant. With him on the briefs was McCrea, P.C.

Rolf C. Moan, Assistant Attorney General, argued the cause for respondent. With him on the brief were Theodore R. Kulongoski, Attorney General, and Virginia L. Linder, Solicitor General.

Before Deits, Chief Judge, and De Muniz and Haselton, Judges.

DE MUNIZ, J.

## DE MUNIZ, J.

Defendant was convicted of two counts each of robbery in the first degree with a firearm, ORS 164.415, burglary in the first degree with a firearm, ORS 164.225, and kidnaping in the second degree with a firearm. ORS 163.225; ORS 161.610. Only two of defendant's three assignments of error merit discussion. Defendant contends that the trial court erred in admitting unreliable eyewitness identifications and in restricting his cross-examination of a witness. We affirm.

On October 16, 1993, three men armed with guns forcibly entered a home in Roseburg while Tina Thurmond and her then 14-year-old daughter, Jamie, were inside. Another man remained outside. All of the men wore some kind of gear to cover their heads so all that could be seen was the area around their eyes. The men ordered the Thurmonds into the bathroom, ransacked the house, took jewelry and other personal items, and then left. After the police arrived, the Thurmonds were able to give general descriptions of the men to officers Reynolds and Fray, including the fact that three had light complexions and one had a dark olive complexion resembling an "Iranian" or "East Indian." During discussions with officers, both on the day of the robbery and the next day, the Thurmonds described the latter robber as five feet eight or nine inches tall, 150 to 160 pounds, with brown eyes and dark brown hair tied in a short pony tail.

About one month later, defendant and four[1] other suspects were arrested in connection with the robbery. Soon after the arrests, officers Strickland, Kincaid, and Estes visited the Thurmonds to explain that one of the suspects, later known to be Krueger, had told them that the robbery was motivated by the expectation that marijuana and cash would be there. They informed the Thurmonds that they had five suspects in custody and then showed the Thurmonds defendant's driver's license and photocopies of the other

---

[1] The police arrested one juvenile and three adults as the ones who went to the Thurmond home. In addition, police arrested another juvenile for aiding the others.

adult suspects' mug shots. The police obtained consent to search the premises for marijuana and found none.

Before trial, defendant moved to suppress any photographic and in-court identifications of him by either Tina or Jamie Thurmond on the ground that the display of the photographs was unduly suggestive. The suppression hearing was held about two years after the crime occurred. At the hearing, the Thurmonds testified that they were able to closely observe the olive-skinned robber because he came into the bathroom and threatened them three or four times during the robbery for a few minutes each time. Reynolds testified that Jamie had given the officer most of the description because Tina felt that Jamie saw them better. However, Tina told Reynolds that she agreed with Jamie's description. Reynolds also testified that, shortly after the crime, both Thurmonds had expressed their belief that they would be able to identify the men involved. Jamie testified that she paid special attention to defendant because she thought she recognized him. Both Thurmonds testified that, when officers showed them defendant's driver's license, they covered the picture so that only the eyes showed and that at that point they were certain that he was one of the robbers. Kincaid remembered that Tina had covered part of defendant's picture and that he felt that "she was drawn to the photograph, that there was something familiar to her." Strickland had no recollection of seeing them look at the photos.

At the conclusion of the suppression hearing, the trial court denied defendant's motion to suppress. At trial, the Thurmonds testified that when officers showed them the photographs they definitely recognized defendant as one of the robbers. They also positively identified defendant in court.

In his first assignment of error, defendant argues that the trial court erred in admitting the photographic and in-court identifications of both witnesses. The determination of whether an identification is sufficiently reliable to be admissible involves two steps:

> "First, the court must determine whether the process leading to the offered identification was suggestive or needlessly departed from procedures * * *. If so, then the

prosecution must satisfy the court that 'the proffered identification had a source independent of the suggestive confrontation' or photographic display, or that other aspects of the identification at the time it was made substantially exclude the risk that it resulted from the suggestive procedure." *State v. Classen*, 285 Or 221, 232, 590 P2d 1198 (1979) (citation and footnote omitted).

Under the first step, the trial court found that displaying defendant's picture immediately after informing the witnesses that the robbers had been arrested was suggestive. However, the court concluded that the identifications were nevertheless admissible under the second step because the state had met its burden to show circumstances that substantially excluded the risk that the identifications resulted from the suggestive procedure.

The state agrees that there is evidence to support the trial court's holding that the photographic identification procedure was suggestive. Therefore, we need only discuss the trial court's holding regarding the second step. In reviewing that holding, we accept the trial court's findings of fact if they are supported by the evidence; however, we are not bound by its legal conclusions if the facts do not support them. *Ball v. Gladden*, 250 Or 485, 487, 443 P2d 621 (1968); *State v. Davie*, 56 Or App 507, 513, 642 P2d 680, *rev den* 293 Or 146 (1982).

In *Classen*, the Supreme Court identified a nonexclusive list of factors that should be considered under the second step. 285 Or at 232-33. Most are relevant here: the witness's opportunity at the time to get a clear view of the persons involved in the crime, the witness's attention given to identifying features, the timing and completeness of the witness's description given after the event, the witness's certainty in the description and subsequent identification, the lapse of time between the original observation and the identification, and the frequency of the witness's contacts with people with the same general characteristics as the person identified. *Id.* We begin with the photographic identifications and discuss each factor in turn.[2]

_____

[2] The admissibility of each witness's identification is properly a separate question. However, we address Jamie's and Tina's identifications together for ease of discussion.

Both victims got a clear view of the suspect. As found by the trial court, the robbery occurred during the daylight and both witnesses had substantial contact with the robber. However, defendant argues that their view of the robber's facial features was restricted to only a small area around the eyes, thus limiting their ability to form a basis from which to identify him.

In both *Davie* and *State v. Robertson*, 42 Or App 471, 600 P2d 935 (1979), we upheld the admission of an out-of-court identification where the witness's view of facial features was limited. In both cases, the identifications were made so soon after the crime that the suspects were still wearing the same clothes worn during the crime.[3] Here, the Thurmonds were not able to supplement their limited view of the robber's facial features with clothing or any other distinctive feature. Nevertheless, it is clear from *Davie* and *Robertson* that the fact that the witnesses were unable to clearly view the robber's facial features does not necessarily prevent the admission of the photographic identification.

The Thurmonds paid close attention to identifying features. Jamie testified that she paid particularly close attention to the olive-skinned robber because she thought she recognized him. Tina testified that she also concentrated on that robber because he had a gun right in her face.

A detailed description was given to police immediately after the robbery and on the next day. Jamie gave a detailed description of the man's height, weight, skin color, eye color, hair and clothing, all of which were consistent with defendant.[4] Tina did not give her own description to the police, but did agree with her daughter's description. That testimony was sufficient to show that she also was able to describe the robber.

---

[3] In *State v. Robertson*, 42 Or App 471, 600 P2d 935 (1979), the identification occurred within 30 or 40 minutes of the crime, and in *State v. Davie*, 56 Or App 507, 642 P2d 680, *rev den* 293 Or 146 (1982), the identification was made within five or six hours.

[4] During the trial, there was evidence that the Thurmonds' description was inconsistent with defendant in various respects. For example, defendant has a scar and some pigment discolorations around his eyes that were not described by the witnesses. However, that evidence was not presented until trial, and we do not consider it in determining the correctness of the trial court's pretrial ruling.

Both witnesses testified that, when they saw defendant's driver's license, they were very certain that he was the one who threatened them in the bathroom. The trial court relied heavily on that testimony in concluding that the witnesses were certain of the identification. Defendant argues that the trial court erred in relying on that testimony because neither witness informed the officers present at the identification that they recognized him.[5] However, the trial court was entitled to weigh the evidence as it saw fit and, accordingly, could rely on the Thurmonds' testimony to establish their certainty at the time of the identification.

Next, we note that a month had passed between the crime and the identification. At that point, the Thurmonds' memories may not have been fresh. Nevertheless, we have upheld identifications that occurred much longer after the crime. *See State v. Schroeder*, 55 Or App 932, 640 P2d 688, *rev den* 293 Or 373 (1982) (upholding identification made eight months after crime).

As to the last *Classen* factor, both defendant and the robber were olive skinned. Both defendant and the state point out that there are not many people with that skin coloring in the Roseburg area. However, that fact alone does not necessarily mean that the Thurmonds were not exposed to people with that particular characteristic, nor does defendant cite any evidence that so indicates. Consequently, we cannot infer from defendant's skin color that the Thurmonds could not distinguish defendant from others of the same skin color.

■ Defendant also argues that we must also consider that, before Jamie's identification of defendant, she had misidentified another person. During the robbery, Jamie thought she recognized the olive-skinned participant as someone from her bus stop. She got the name of the person from a high school year book. Later, however, she recanted

---

[5] Somewhat related to this argument, defendant contends that other testimony controverted Tina's insistence that defendant's driver's license showed the man who threatened her in the bathroom. Defendant points to Tina's testimony that she recognized all three of the men in the pictures, despite the fact that she never got close to one of them, and he was completely covered except for the eyes. Again, defendant relies on evidence not presented until trial, and, consequently, we do not consider it. *See* note 4 above.

that identification on either learning that that person had an alibi or seeing a full-body picture of that person.

The state argues that the fact that she "thought" that she recognized the intruder as someone she knew should not exclude her subsequent identification. We agree. However, a misidentification reflects on a witness's actual ability to recognize a defendant, and, although a previous misidentification is not included in the *Classen* list, it is nevertheless an appropriate consideration. It is particularly relevant here because the misidentification, like the identification in question, was based on a photograph and, consequently, calls into question Jamie's ability to make a photographic identification independent of the suggestive display.

We cannot conclude, however, based on the record of the suppression hearing, that the admission of either Tina's or Jamie's out-of-court identification was error. Although there are circumstances here that could call the trustworthiness of the Thurmonds' identifications into question, the ultimate reliability and probative force under the circumstances of the identification remain questions for the jury. *Classen*, 285 Or at 233. The issue properly before the trial court at the suppression hearing was whether the state offered sufficient proof that the photographic identifications had a source independent of the suggestive procedure. The trial court concluded that the identifications were based on the Thurmonds' recollection of the robbery and not on the suggestive procedure. There is evidence to support that conclusion. Accordingly, the admission of those out-of-court identifications was not error.

■ We next turn to the admissibility of the in-court identifications. To determine whether the in-court identifications were properly admitted, we again apply the *Classen* test. *State v. Ponce*, 54 Or App 581, 588, 635 P2d 1042 (1981), *rev den* 292 Or 568 (1982). The trial court found that the in-court identifications were based on a source independent of the suggestive photographic procedure.

Again, the trial court's findings are supported by the evidence. As previously discussed, the Thurmonds paid close attention to the robber, and they provided a description soon after the event. In addition, at trial the Thurmonds had the

benefit of seeing defendant's build and height. Although the trial was held approximately two years after the robbery, both Jamie and Tina were positive that defendant was the man who threatened them in the bathroom. The trial court did not err in admitting the in-court identifications.

◼ In his second assignment of error, defendant contends that he was denied his right to confrontation.[6] Defense counsel knew that Krueger, one of the juveniles already convicted of the robbery, had said that Jamie had sold him marijuana and that Jamie had also told him that her parents grew marijuana on the property. Defendant contends that the trial court erred in refusing to allow him to cross-examine Jamie about the purported drug transaction between Krueger and Jamie. He argues that he was denied his constitutional right to a full and complete cross-examination on pertinent issues of impeachment and credibility.

The issue first arose during a trial recess before Krueger's and Jamie's testimony. At that time, the prosecutor told the court that she saw a potential problem if defense counsel raised the transaction on cross-examination, because either Krueger or Jamie could invoke the right not to testify. The prosecutor told the court that she wanted to raise the issue outside the jury's presence because of the "rule that has to do with people invoking their rights in front of the jury."[7] Defense counsel informed the court that he did intend to inquire about the transaction.

The prosecutor then told the court what she anticipated would be the testimony from Krueger and Jamie. The prosecutor thought that Krueger would testify that he purchased marijuana from Jamie at school and that Jamie had said that her parents had marijuana at their house and that

---

[6] Defendant cites the Fifth Amendment and Article I, section 11, of the Oregon Constitution, but does not make separate arguments.

[7] OEC 513 provides, in part:

"(1) The claim of a privilege, whether in the present proceeding or upon a prior occasion, is not a proper subject of comment by judge or counsel. No inference may be drawn from a claim of privilege.

"(2) In jury cases, proceedings shall be conducted, to the extent practicable, so as to facilitate the making of claims of privilege without the knowledge of the jury."

that is where she got the drug. The prosecutor thought that Jamie would testify that she did sell Krueger drugs that she told him were from her parent's residence but that she had actually obtained the drugs from another source.

The trial court noted, however, that, at that point in the trial, it did not know that the witnesses would invoke their right not to testify. The prosecutor then decided to proceed with Krueger's testimony, as there was "no issue" as to him and to "deal with the other issue later" when Jamie was a witness. On cross-examination, without objection from the state, Krueger then testified that he bought marijuana from Jamie and decided to rob the residence because he thought there was a marijuana-growing operation there based on what Jamie told him.

Before calling Jamie as a witness, the prosecutor informed the court that Jamie had indicated that she would invoke her right not to testify about the drug transaction. The prosecutor then called Jamie to the stand, and she testified that she did not "wish to talk" about any issue related to a marijuana sale to Krueger. Defense counsel inquired, confirming that Jamie intended to invoke her right not to testify.

Defense counsel noted defendant's right of confrontation. During the colloquy that followed, defense counsel stated that the issue "could be avoided" if the prosecutor would offer Jamie immunity. The state made no response. The trial court then decided to appoint counsel for Jamie and limited the questioning of her at that time only to the robbery. After a recess and a colloquy between the court, prosecutor, defense counsel and Jamie's counsel, the court held that defense counsel could not inquire about the drug transaction in front of the jury. In his offer of proof, defense counsel asked Jamie about the purported transaction, and she invoked her right against self-incrimination and refused to answer.

Defendant argues that it is "well settled" that even a juvenile who is subject to prosecution may be receiving beneficial and preferential treatment from the prosecution and that his right of confrontation entitled him to explore that bias in cross-examination. *Davis v. Alaska*, 415 US 308, 94 S Ct 1105, 39 L Ed 2d 347 (1974). It is error for the trial judge

to exclude evidence that establishes sufficient facts from which bias or interest of a witness may be inferred. *State v. Hubbard*, 297 Or 789, 800, 688 P2d 1311 (1984).[8] Where the court's decision to curtail questioning is made before bias or interest is shown, we review the court's decision for error of law. *Id.*

The state argues that defendant failed to show that the questions were relevant to support an inference of bias or interest and, therefore, that he failed to show that the questions implicated his right of confrontation. It argues that, in his offer of proof, defendant did not attempt to introduce evidence that the state had decided not to investigate Jamie's activities or to prosecute her or that concessions had been granted in exchange for Jamie's testimony.

■ Defendant was not required to make that showing to establish a reason for bias. Matters not otherwise relevant may be admitted for the mere tendency to prove bias or interest. *Shrock v. Goodell*, 270 Or 504, 510, 528 P2d 1048 (1974). The prosecutor acknowledged during colloquy that the delivery of a controlled substance is an "A felony" offense. The arguments of the prosecutor, defense counsel, and Jamie's counsel all treated the drug transaction as still within the statute of limitations. Jamie's involvement in the drug transaction made her subject to possible prosecution. The possibility of prosecution was sufficient to create an inference that Jamie's testimony was motivated by a desire to curry favor with the state in order to avoid prosecution. *See Hubbard*, 297 Or at 798 (In some situations, an initial showing of bias or interest is apparent from the circumstances of the trial.).

The situation here is analogous to that in *Davis*, in which the Supreme Court reversed a state conviction when the trial court refused to permit the defendant to cross-examine the state's key witness about his prior juvenile adjudications and probation status. The Supreme Court noted that the partiality of a witness is always relevant to discredit the witness, 415 US at 316, and that, although defense counsel

---

[8] In *State v. Hubbard*, 297 Or 789, 799, 688 P2d 1311 (1984), the Supreme Court stated: "The discretion of the trial judge to control the scope of cross-examination pursuant to OEC 622(2) does not allow the exclusion of evidence offered to impeach a witness for bias or interest."

had been allowed to ask the witness *whether* he was biased, counsel had not been able to make a record from which to argue *why* the witness was biased or otherwise would have lacked the degree of impartiality expected of a witness:

> "[I]t seems clear to us that to make any such inquiry effective, defense counsel should have been permitted to expose to the jury the facts from which jurors, as the sole triers of fact and credibility, could appropriately draw inferences relating to the reliability of the witness." *Id.* at 318.

The Court rejected the argument that the state's policy interest in keeping juvenile records confidential required the defendant to yield "so vital a constitutional right as the effective cross-examination for bias of an adverse witness." *Id.* at 320.

Here, defendant was denied the opportunity to expose Jamie's bias because of the clash between two conflicting constitutional rights. As defendant correctly notes, the court could neither deny defendant's right of confrontation on cross-examination nor deny Jamie's right to claim her right against self-incrimination. Defense counsel recognized that a grant of immunity would solve the conflict.[9]

However, the immunity statutes, ORS 136.617 and ORS 136.619, allow the state, not a defendant, to move for an order compelling a witness to testify. Here, Jamie was the state's witness, and the state knew that she would not testify. The state had available to it the remedy of immunity, which would have avoided the constitutional conflict. Nonetheless, the state did not offer immunity, and the court accepted the state's position that Jamie could testify, unburdened by defendant's proposed cross-examination. The court could not, however, ignore the conflict and the assertion of defendant's right to cross-examination. When the state failed to offer Jamie immunity, the court should have refused to permit Jamie to testify.[10]

---

[9] Defendant points out:

"There is really no material difference whether the necessity to grant immunity arises from a refusal to give testimony the state wants to hear, or evidence the state would rather not hear, but to which the defendant has an absolute constitutional right. The state has the usual decision to make, *i.e.*, is the testimony worth the grant of the immunity."

[10] Jamie made her claim of privilege outside the presence of the jury and before she gave any testimony. *See State v. Johnson,* 243 Or 532, 539, 413 P2d 383 (1966)

■ After the court later denied defendant the right to cross-examine, defendant did not move to strike Jamie's testimony. *See State v. Lea*, 146 Or App 473, 481, 934 P2d 460, *rev den* 325 Or 438 (1997) (striking some or all of a witness's testimony may be an appropriate remedy for that person's refusal to answer questions on cross-examination). Although defendant did not ask the court to exclude Jamie's testimony, nonetheless, he has stated a violation of his right of confrontation by showing that he was prohibited from engaging in otherwise appropriate cross-examination designed to show bias. *Delaware v. Van Arsdall*, 475 US 673, 680, 106 S Ct 1431, 89 L Ed 2d 674 (1986). Once that showing is made, "[t]he correct inquiry is whether, assuming that the damaging potential of the cross-examination were fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt." *Id.* at 684. That determination

> "depends upon a host of factors, all readily accessible to reviewing courts. These factors include the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case." *Id.*

■ Here, without the impeachment evidence, the state was able to present Jamie's testimony without any suggestion that there could be reasons that her testimony was self-interested. However, even if defendant had been able to

---

(whether a witness will refuse to testify can be determined in absence of jury before witness testifies). The state took the position that, under OEC 513, Jamie could not be required to claim her rights in front of the jury. The court apparently accepted that argument. Case law holds that "[i]t is error to call a witness to the stand for the sole purpose of forcing that witness to invoke, in the presence of the jury, his or her Fifth Amendment privilege; it is likewise error to comment in jury argument on the failure of a witness to testify who has validly invoked that privilege." *State v. Froats*, 47 Or App 819, 821, 615 P2d 1078 (1980) (citing as authority, *inter alia*, *State v. Abbott*, 275 Or 611, 552 P2d 238 (1976); *Johnson*).

OEC 513(2), however, requires that, "to the extent practicable," the claim should be made out of the jury's presence. Defendant does not argue that Jamie should have been required to claim her Fifth Amendment privilege in front of the jury, and we do not decide whether OEC 513 would bar Jamie's claim in front of the jury under these circumstances.

make that showing, Jamie's testimony was not solely determinative of the outcome of the trial. There was corroborating evidence of defendant's participation in the robbery. Krueger testified that defendant participated with him in the robbery. As accomplice testimony, that evidence could not support a conviction unless corroborated by other evidence that tended to connect defendant to the offense. ORS 136.440(1). However, Jamie's mother also testified:

> "[The police] had said that they had arrested some individuals and there were some photographs that they put on the coffee table and asked if I recognized any of the people there and I looked at them momentarily and then I covered up the pictures, you know, the main portion of their face (Indicating) excluding the eyes and determined that indeed those were the eyes.
>
> "* * * * *
>
> "Q   And you were able to pick them out as the people that were definitely in your house?
>
> "A   Yes. I was concerned at first if I was going to be able to really feel comfortable in accusing someone by just seeing their eyes and that was a big concern of mine. I have a son and I sure wouldn't want him wrongly accused, but once I saw the pictures and saw the eyes I felt so much better because I knew then that I would be able to truthfully and honestly identify the people by what I saw. It was enough for me to determine.
>
> "Q   Do you recognize anyone in the courtroom today as having been in your house that day?
>
> "A   Yes, I do.
>
> "Q   Could you point that person out for the jury?
>
> "A   Right there. (Indicating [defendant])."[11]

In addition, in defendant's testimony, although denying participation in the robbery, defendant admitted that he drove the others to and from the victims' property. The victims also testified that one of the intruders wore

---

[11] As noted earlier, a police search of Jamie's residence had not revealed any drugs, and Jamie's mother's testimony was not subject to the same suggestion that she hoped to curry favor with the state to avoid prosecution.

"brown hiking boots with the red laces," and, although they believed that someone other than defendant had worn those boots, defendant admitted that he wore "brown shoes with red laces" on the day of the robbery. Boots with red laces were subsequently discovered in his bedroom. An officer also testified that a bullet found in defendant's room was a bullet "that could fit into an assault rifle of the type seized in this case" from the accomplices. We conclude that, beyond a reasonable doubt, the violation of defendant's right to confront Jamie with reasons for possible bias here was harmless error.

Affirmed.